and Illinois Limited Liability Company, et al., Applebee's, v. Steven Barboa Good morning, Your Honors, Counsel, and may it please the Court. My name is Scott Friedman, and together with my co-counsel, David Nightingale, we represent the appellant in this matter, Englewood Construction. Your Honors, our appeal basically presents three issues to this Court, two of which concern the trial court's interpretation and application of applicable Illinois law, and one that is of discretion. As to the first issue, it is Englewood's position that the trial court erred as a matter of law by invalidating Englewood's mechanics lien. Englewood posits a very simple proposition. A lien that is valid on the day of recording cannot be found to be fraudulent under Section 7 to the Illinois Mechanics Lien Act based on subsequent payments made by an owner to the lien claimant's subcontractors. Now, admittedly, there is no Illinois case directly on point. Englewood's argument is based on a plain reading of Section 7 to the Illinois Mechanics Lien Act, as well as case law applying Section 7. We are here asking this Court to hold that the validity of a mechanics lien is to be by an owner. Accepting that that is correct, to what extent does a lien claimant have a duty to verify the amount claimed in the lien prior to filing? Well, Your Honor, I think that the issue really goes to the way the process of construction and processing of payments work. Under a typical construction agreement, which is what we have here, it's an AIA form agreement unmodified, an owner does not have a right to direct pay trade contractors. So in the hypothetical that you pose, if the owner were to pay a subcontractor on a Tuesday but the contractor called on a Monday, they wouldn't know. The person who is in the best position to advise about having paid subcontractors is the owners, the person making the payment. I agree with the Court's premise that there is a burden, but the issue that we see is that standard practice is that a contractor relies on its own records of payments received by the owner and then payments made to its subcontractors. Does that address the Court's question?  Okay. Thank you. So at some point in time after recording, McMahon provided certain documentation and we believe that that documentation was insufficient. Now, the first point that I was raising was about Section 7 to the Mechanics Lien Act. And Section 7 says, no lien shall be defeated to the proper amount thereof because of an error or overcharging on the part of any person claiming a lien, therefore, under this Act, unless it shall be shown that such error or overcharge is made with the intent to defraud. That's the language of Section 7. The key here is the word made. In this context, we submit that the word made is synonymous with the word filed or recorded. This conclusion is consistent, we believe, with Illinois applicable case law interpreting Section 7. As the Court in Roman Gulf Design v. Kiesler stated, although Section 7 of the Mechanics Lien Act states that an intent to defraud is necessary before a Mechanics Lien will be defeated due to an error or overcharge, our courts have held that where a lien claimant knowingly files a lien containing a substantial overcharge, the claim should be defeated on the basis of constructive fraud. Again, in that holding, the key is the word filed. That is whether a lien is fraudulent is to be determined on the date of filing. Counsel, in the 52 minutes between the time that the documents were tendered and the filing, were the documents that were tendered by McMahon in compliance with the requirements of the Mechanics Lien as to the information, the contract, all the requirements for definitions of who was paid, the site, the job title, everything that was required under the Act? Well, so let's step back one second. So the original lien was filed in February. What you're talking about is the amended lien. First. Excuse me? Nothing. Oh, I'm sorry. So the question of lien waivers themselves is that the Mechanics Lien Act actually doesn't require lien waivers. So the issue at hand is whether or not a lien waiver, and we cite this in our brief, is whether the lien waiver is valid really turns on a question of whether or not the subcontractor had been paid. So the courts have held that a lien waiver can be repudiated. If the subcontractor is not paid, they tender a waiver and they're not paid, then it can be repudiated. If it's repudiated, it's of no value. And so that's the issue we were faced with. If you look at our papers, what we explained to the court in our papers was that on March 9th, counsel for Englewood had requested copies of canceled checks. The only way that we would actually know that somebody had been paid was canceled checks. So in terms of what the Act itself requires, the Act doesn't require Mechanics Lien waivers. The Act, you know, that's part of common practices to provide lien waivers. And authorizations to reimburse, which was the other document that was provided, isn't covered in the Mechanics Lien Act. So now, in getting to this point, McMahon argues that we had actual knowledge that the lien was overstated because we possessed proof of the payment. The record, however, is clear that we had no evidence. We did not receive such information. In fact, the first time we received it was as part of McMahon's motion for summary judgment in September, and those were when he supplied canceled checks. That was the first time that we had received it. At no point in the litigation did McMahon come forward with any evidence showing that Englewood was aware of the payments before Englewood filed its lien. The basis for McMahon's claim that Englewood had knowledge was because McMahon had sent, as Justice Davenport pointed out, copies of lien waivers and authorizations to reimburse. And it's Edward Hines' lumber, Your Honor, that holds that a lien waiver issued in anticipation of payment may be repudiated. So again, and in fact, one more point on the lien waivers themselves was that the waiver form was improper. It indicated that McMahon was the contractor, not Englewood. And so we still remain liable. We remain liable under the contract, and that was a big struggle that we had. So without proof of payment, a lien waiver is literally of no value. And again, as we pointed out, Englewood was asking for canceled checks, and it is clear that McMahon had canceled checks. They produced all the canceled checks in the motion for summary judgment, and had they simply produced those checks in March or April, as the record suggests that they had them in their possession, we wouldn't be arguing about the invalidation of the lien. Because I submit, Your Honor, that the proper remedy that the trial court should have exercised and could have exercised to support sitting inequity is it could have directed Englewood to reduce its lien, to file a partial release of lien. And in fact, if you look at the record, that's exactly what Englewood did. After receiving all the documentation in September, it reduced it by about $400,000, based on information that it was able to ascertain with regard to payments made. That's the process. The process that you go through is you record a lien, it has a value, you make a payment, you file or record a partial reduction in the lien. The trial court's second error is granting McMahon's motion for summary judgment on McMahon's quiet title action. Now, the premise of a quiet title action is that it has to be a cloud on title. So if the trial court erred in finding the lien was invalid, then obviously it can't be a cloud on title, and that quiet title action must fail. But even if the trial court had not erred in invalidating the lien, the trial court still erred in awarding McMahon compensatory damages. Although unreported, the court in Kingston Partners v. Lynn Plaza supports the conclusion that compensatory damages are not recoverable in an action to quiet title where the plaintiff has not proven a corresponding claim for slander of title, a tort which requires malice. There was no finding of malice in the court's May 2024 order granting McMahon's motion for summary judgment on its quiet title action. Further, as the court in Gambino v. Boulevard Mortgage recognized, McMahon would only have been entitled to recover those costs directly related to prosecuting the quiet title action. The increased financing costs that the trial court awarded to McMahon were not directly related to the quiet title action. If McMahon had wanted to recover compensatory damages, it could have filed a slander of title action, which it did not. It simply filed an action to quiet title and for declaratory relief to have the lien stricken. Now, in support of its claim for damages, McMahon relies on the affidavit of Stephen Vallette. The main issue for which the Vallette affidavit was proffered was the conditions and timing for the conversion of the construction loan to permanent financing. Now, Englewood moved to have that affidavit stricken because Mr. Vallette demonstrated at his deposition that he did not have personal knowledge as to the matters set forth in his affidavit. Specifically, Englewood took exception to two averments in the affidavit. The first being Buttsy approved and provided McMahon with construction financing and required after substantial completion of the construction at the property that it convert the construction financing to a permanent loan at the then prevailing rate offered or available from Buttsy. And the second averment was upon substantial completion of the construction at the property, McMahon inquired about securing a permanent loan of the construction financing. So the key to that is substantial completion. Now, based on both of these averments, Mr. Vallette stated under oath that substantial completion of the construction was a condition preceding to the conversion of the construction to permanent loan and that the project was, in fact, substantially complete in March of 2021. The record, however, is clear. Mr. Vallette could not competently testify regarding either the conditions preceding under the loan or the stage of completion of the project in March of 2021. So without these two paragraphs, Mr. Vallette's affidavit is pretty much useless. There is no way that the trial court could conclude that there was substantial completion and that the loan could be converted. This conclusion, however, was essential to the court's granting of damages, compensatory damages against Englewood. Absent this finding, the most that Vallette affidavit was a value for was that Mr. McMahon had called Bussy Bank in March and that someone told him that the rate was 2.36% per annum at that time. Now, despite these... Go back for a second. Certainly, Judge. If we were to agree with the trial court for the sake of analysis that the lien was fraudulent, isn't that conclusion somewhat analogous to the malice and slander of title that basically is why we allow compensatory damages in that context? No, because it's constructive fraud. So the court never made a finding that it was fraud. The courts always treat it as constructive fraud. So it could be an error. It could be. So, again, there was no finding of malice. There was no analysis that allowed the court to reach that conclusion, that, in fact, it had been done maliciously. So we do not believe that that fact is present just simply based on the record that was before the trial court at that time. So if there were a trial and there was evidence to support that conclusion, would you agree in that context that even without a slander of title action, you could recover compensatory damages? If the court was able to conform the proofs to the pleadings, I believe that that would be appropriate. So now the last issue, and I'm going to try to speed this up because I see my time is running, has to do with the trial court's abuse of discretion, which I think is where a lot of the meat is, and in entering these sanctions against Englewood that barred Englewood from prosecuting its claims against McMahon and defending itself against McMahon's counterclaim. And it's our position that the sanctions order of June 27, 2022, was punitive and contrary to applicable law and the purposes of Rule 219C. As the Illinois Supreme Court in Chimanovsky v. General Motors stated, when imposing sanctions under 219C, the court's purpose is to coerce compliance with discovery rules and orders not to punish the dilatory party. This court in Donner v. Deere stated that the sanction of dismissal should be imposed reluctantly and only as a last resort when enforcement powers at the court's disposal have failed to advance the litigation. Now McMahon claims that this dilatory conduct harms McMahon, but McMahon offers no explanation of exactly how Englewood's conduct prejudiced or disadvantaged McMahon. And what I will tell the court is that there were three instances where Englewood failed to comply. One, answering McMahon's counterclaim. Two, responding to McMahon's motion for summary judgment. And three, responding to written discovery. All of those had been addressed. There was a delay, admittedly, but they were addressed. But the delays had no appreciable impact on the litigation because the focus of the litigation was the invalidation of the mechanics lien, which did not rely on answering the complaint, nor did it rely on answering discovery. It only relied on these prior payments that were made. I see my time is up. If the court has any further questions, I'm happy to address them. No. Thank you very much. Thank you. Mr. Braden in rebuttal. Mr. Varhola. May it please the court. Good morning, Your Honors. My name is Steve Varhola. I'm here with co-counsel Mark Lyman. We represent the defendants at police, J.P. McMahon, Properties, LLC, and J.P. McMahon, Petrochemical Transport Group. As we stated in our briefs and as we'll state today, this matter involves a dishonest lien claimant. They abused the Mechanics Lien Act. How did they abuse the Mechanics Lien Act? They recorded a lien that was substantially inflated by 89%. Was the original lien, was there any problem with the original lien? Yes, Your Honor. What was that? It was overstated. It was inflated at the time that it was recorded on February 24th, and subsequently when Englewood tried to amend it, it still was inflated. It's always been our position that the amounts that it was claiming, it was claiming amounts that it alleged were owed to subcontractors who had improved the property. It's simple, Judge. If the subcontractors weren't owed that money, those monies could not be included in a Mechanics Lien. At that point, there was no legal basis, and it is our position since the lien was substantially inflated by 89% of amounts that were paid by my client, it was unfounded and never should have been recorded in the first place. Isn't the standard practice you would have a contractor statement that would be filled out by Englewood? It's a very good point, Your Honor. But then they would request payment for their subs? In this particular situation, Your Honor, a dispute arose early on within six months of the parties contracting. It was in January of 2021. Shortly after that dispute, I want to say five days, Englewood sends a notice of defaulted nonpayment to my client. At that point, my client disputes the nonpayment and demands that Englewood provide a revised contractor statement, as you alluded to, that set forth the accurate amounts that were agreed to between Englewood, the subcontractors, and McMahon. We had a recalcitrant general contractor here. They refused to do that, Your Honor. That was in February of 2021, February 5th. That's 19 days before the lien is recorded. What does Englewood do at that point? It does nothing. It refuses to do anything, shuts down the project, terminates its contracts with its subcontractors. We've got evidence of the termination in the records. It then terminates its contract with McMahon. The whole while, McMahon's looking at them going, Wait a second, we've paid the subs. We're telling you that your numbers are wrong. Work with us. Englewood goes silent. They record their lien on February 24th. When had the subs been paid by McMahon? You just said that we paid the subs. Your Honor, very good question. That's why I included the chart in our brief. There are several payments that are made prior to February 24th. Prior to the termination of the agreement when the contract was declared void or that McMahon said that there was no agreement anymore? I understand your question. It's when Englewood terminated the contract. I believe they terminated it on February 18th. Then they recorded their lien on February 24th. So my question is, did McMahon make payments before the contract was terminated? Yes, Your Honor, but there are several payments. I'm not going to say to the court that all the payments were made, but there are several payments that are identified in the chart that I believe is on page 9 of our brief. Okay, thank you. So shortly after this dispute and the parties are not communicating, my client goes out, my client, and it's very refreshing, Your Honor. I believe it was Justice Brennan who pointed out and inquired, was there a duty to verify prior to recording the mechanics lien? And I believe we got, finally, after four years in admission from Englewood, there's an obligation to do so. They didn't do so, especially when my client brought to their attention, I have lien waivers, I have authorizations to reimburse owner. The lien waivers, if you read them, they indicate that those particular subs were waiving their lien rights. The authorization to reimburse the owners demonstrates I received payment. You can release payment. They're directing the title company. You can release payment to McMahon so that McMahon can continue on with this project. Englewood wasn't named on a lot of those, though, right? Your Honor, the initial lien waivers had my client identified on it, and the reason why they were identified on it is because, as Justice Davenport pointed out, Englewood had terminated the contract and terminated the subcontract. I don't have the language in front of me, but my recollection is that it was almost to the point of, for claims moving forward, it didn't seem to go backwards in time. So someone could look at this and say, well, McMahon's released, but what about Englewood? I disagree. Well, Your Honor, there were also covenants not to sue. That would address that but relating to which party? Englewood or McMahon? That would pertain to Englewood. I believe Judge Foreman said. I think from a practical standpoint, perhaps, from an unjust enrichment situation, perhaps, but Englewood wasn't named in all of those. It was McMahon that they promised not to sue. That was in the initial lien waivers. Right. Then there were amended lien waivers that we went out and obtained to appease Englewood. Englewood's right was that we're not identified in these lien waivers. So we did go out and we obtained those, Judge. But we also went the extra mile and grabbed covenants not to sue. And when you review those covenants not to sue, the specific language in there states that we are not suing anybody on any contract related to the work that we have been paid for on this particular project. I paraphrase. But going back to the production of those lien waivers, Your Honor, and also the production of those authorizations to reimburse owner, along with my client's dispute prior to them recording and shortly thereafter, clearly set forth the intent to defraud and the constructive fraud that arose from Englewood's actions. The specific case of MEP v. Trucco, which we cite in our brief, I believe the factual scenario is identical to this. Shortly before we filed our motion for summary judgment, in this particular case, shortly before they filed their motion for summary judgment, the owner put the general contractor on notice. There's some issues here. What you're doing is constructive fraud. This is what we believe demonstrates the constructive fraud. In our situation, how do we demonstrate it? We paid. We paid, we paid, we paid. What did the contractor do in MEP?  They did nothing. They did not dismiss their lien. They did not remove their lien. They did nothing. That's precisely what happened here. That supports the proposition that Englewood did have an obligation to verify the accuracy of its lien amount before recording, and it didn't. It knew what it was doing, Your Honors. It had an agenda. It was malicious. It's a contractor. It had been in business for a while. It knew by placing that lien on the property, McMahon would be frustrated in the sense that it would not be able to obtain permanent financing, thereby causing damage to it, which is what we sought. We sought those very damages in our quiet title action that arose from the lien. If we were creating a Venn diagram, I think we can all do this. If we were to create a Venn diagram and compare the documentation you provided as part of the motion for summary judgment one in terms of lien waivers and subcontractors and everything related to the subcontractors, and compare that to what had been provided to Englewood previously, how much more information was given at that point? Your Honor, I believe in addition to the initial lien waivers and the authorizations, what we gave were the covenants not to sue from each of the subcontractors, and we also produced a copy of the cancel checks. And that was in addition to what was initially provided to them. At some point, either in your briefs or in the record, you indicate that it cost your client tens of thousands of dollars to put together this documentation. And I'm asking about this figure and this concept in terms of how much time and effort was involved, because you say that Englewood had a duty to do that kind of an examination, presumably, but you suggest they should probably have done it very quickly when it seems that it wasn't. You weren't able to do it so quickly or so cheaply. So I'm just curious, am I misconstruing that, or what's your opinion? Your Honor, I think you have to look at the totality of the circumstances, at least from my client's perspective. My client wasn't dealing with the subs from the outset. So there was going to be a learning curve there. They had to get in touch with the people. They had to find the appropriate person. We had to prepare the forms. We had to get the signatures to them. I think we had 20-plus subcontractors. So there was a lot of work that would involve time and effort there, and the cost, the expense associated with that. With respect to Englewood, Englewood is the one who hired all the subcontractors. Englewood's the one that had the experience and the knowledge of the subcontractor. They could have easily called each subcontractor regarding the amounts that they were including in their inflated lien and asked them, have you been paid? They didn't do that, Your Honor, and their silence speaks volumes. They say that there's nothing in the record that demonstrates it. It's not in the record because they've never taken the position that we did our due diligence. They're taking the position that their lien was valid on February 24th. They didn't have anything to do or any obligation to verify that. We find that that is completely wrong, misinterprets the Act and the obligations under the Act. They had a duty to demonstrate that it was either a mistake or it was done in error. They didn't do that, Your Honor. What they did do is they stuck their head in the sand, they didn't demonstrate that the $1.692 million was valid, and Judge Anderson, your colleague, rightly found that it wasn't that. My colleague is not relevant, obviously, to our discussion now. Understood, Your Honor. Got a little out of hand. Justice Anderson found that $1.5 of the $1.692 was substantially inflated, and it was, Your Honor. We have the evidence to demonstrate that in the form of the lien waivers, the authorizations, the covenants not to sue. Also, we have the canceled checks. After we reviewed the documents related to the motion for summary judgment number one, the lien was reduced, but not eliminated. It was reduced to a half a million and change. What do you say as it relates to that number? I mean, is that a fraudulent number? I mean, we never got there because everything was essentially ended because of the fraud finding, but was that still a valid number? Respectfully, Your Honor, we did get there. That was an invalid number. Justice Anderson found that $1.5 of the $1.6 was substantially inflated, so that left $160 and change. Englewood never demonstrated that it was entitled to that amount, so our position is, yes, Your Honor, the $559,000 was invalid, it was unfounded, and it constituted a cloud on title, entitling my client to its damages. Can you explain to me, sir, why you were paying a sub in 2020 when the contract with Englewood was in full force in effect and it hadn't been broken? Well before the problem in January of 21. According to the chart that you referenced earlier when I asked you about that, there was a reference in 2020 when you were paying a sub? Your Honor, I'm not aware that we would have paid a subcontractor in 2020, but it appears that you're reviewing Halloway Myers. I'm just looking at the chart that you referenced. It looks like Halloway Myers you paid in 2020, and that's the chart that you were referencing. So I just was wondering why you would have been paying a sub then for $37,000 when the contract was still in effect and hadn't broken apart. Your Honor, I would only have to speculate that there was a deposit made there to ensure that Halloway Myers would be present on the project. That's the next line that says deposit, and that was also in 2020. There were two payments made in 2020. Thank you. If you don't recall, that's fair answer. Respectfully, Your Honor, I don't recall that. Thank you. You have 30 seconds, I believe. Your Honor. You can wind up. Thank you. Your Honor, I believe that the trial court considered the facts and considered the law, and as a court of equity, had every right to do what it did. And when I say what it did, it did substantial justice between the parties. Clearly, the lien was unfounded. Clearly, my client was damaged in the sense that it had to pay an additional amount of interest. They had affidavits from the bank that demonstrated that there was a then rate of 2.36 that they would have been able to obtain and secure permanent financing. They were unable to do so because of the mechanics lien. After the lien was removed, they got a favorable rate of 3%. They still incurred $83,000 worth of damages. The case law cited by Englewood does not support their proposition that the court of equity cannot award compensatory damages. I couldn't help but notice the case that they relied upon escapes my name, or the name escapes me, but they point out that it starts with compensatory damages are not permitted in the event that there's not a slander of title. I read that case a couple times. It doesn't say compensatory damages. It says attorney's fees. They're focusing on the attorney's fees aspect. We weren't seeking attorney's fees. We were seeking the damages that directly related to the clout on our title. Justice Anderson, pursuant to his discretion, took it into his own hands and did complete justice, equitably and through a monetary relief. Thank you. Thank you, Mr. Ryan. Any additional questions? No, not for me. No, thank you. All right. Mr. Frayden, you're up. Thank you, Your Honors. So as we point out in our reply brief, there is an absence of a timeline in what occurred. And amazingly, in response to a question from Justice Davenport, counsel said that of all the documentation they provided, implying that all of this documentation was provided in March, the waivers of the corrected waivers of liens, the canceled checks, the covenants not to sue, those were provided in September of 2021, six months after the lien was recorded. There were a number of statements that counsel made that are not supported by the record. He stated that the lien was overstated by 89% at the time of recording. I think you can review the chart and see that that was not the case. Certainly, they had made some payments. That's what the evidence ultimately proved. But again, what we requested, which was a completely reasonable request, was canceled checks. They had the canceled checks. You don't hear counsel explaining why they waited six months to provide us with the documentation that we requested. And what do you say to this suggestion that you're the – Englewood has the relationship with subcontractors. All Englewood has to do is pick up the phone and say, hey, where do you pay? And probably could do that more expeditiously than perhaps McMahon could, at least at that juncture. Well, I would submit that that's not the normal process in construction. Again, direct pay to trades is not the normal process in construction. If that were the normal process in construction, you wouldn't have these lien claims. You would have a general contractor leaning for a month that he's owed. They did not – there is nothing in the record, not a single shred of evidence to support the idea, as counsel stated on the record for this court, that they called Englewood and said, hey, we're paying them before we recorded the lien. That's made up. There is nothing in the record to support that. The first time we find out that they've been paying is when they tell us on March 15th. Here are some incorrect waivers and authorizations to reimburse. We said we need canceled checks. They waited and waited and waited. Now, the issue – I do want to point out MEP versus Truco that they cite, and it's very important to understand this. In MEP versus Truco, the lien claimant who was claiming amounts owed to others in their lien wasn't in privity of contract with them. They weren't subcontractors. They were other contractors under contract with the owner. So it was clear that they were never entitled to those funds. That's not the case here. We were under contract with those subcontractors, and we remained liable to those subcontractors. We terminated for convenience those subcontracts. We didn't terminate those subcontracts for cause. Our obligation to pay those subcontractors remained. It remained under the Mechanics Lien Act, and it remained until we had clear evidence. And perhaps the covenants not to sue were clear evidence, but we didn't have that until September. And then you ask the question, well, what about the reduction of the lien? We reduced the lien based on the information we were able to discern from the documentation that McMahon had finally provided in September of 2021. There is no reason for us to overlien the project. I take strong exception, as we pointed out in our brief, to ideas that we were dishonest, that we did it with malice, that we intended to harm. We didn't do that. We have subcontractors that needed to be paid. We need to pay people. There was no malice. I think that the duty under the Act to do due diligence, strike that. Counsel said that there is a duty under the Act to do due diligence. I would submit that the Act does not say that. Again, I'm pointing out that at the time, you do what is normal in the industry, which is you lien for amounts that you believe that you're due based on your accounting and your records. And so there is no basis to say. I guess in a skit, first off, I never said that I had an obligation or Englewood had an obligation. Counsel said it's been four years, and they finally admit that they had an obligation. I did not say we had an obligation. I say if you have to look at two burdens on this, then the burden shifts, I think, to the person who's making the payments versus the person who has to call everybody and say, hey, did you get paid? Because, again, as I pointed out, if I call you on a Monday and you say, I haven't been paid, but they pay him on a Tuesday, did my lien now fraudulent? That's the problem with their argument. And with that, I see my time has expired. Thank you very much, Your Honor. Any questions? No. Thank you, sir. Thank you. All right. The court thinks both sides for security arguments. We will take the matter under advisement and render a decision in due course.